[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-12277

_____

PHILIP FOWLER
JEFFREY SWANS,

                                        Plaintiffs-Appellants,

*versus*

OSP PREVENTION GROUP, INC.
WILLIAM E MABRY II,

                                        Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia

D.C. Docket No. 1:17-cv-03911-MHC

————————————————

Before ROSENBAUM, LAGOA, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Philip Fowler and Jeffrey Swans worked as property damage investigators for OSP Prevention Group.  It contracts with broadband service providers to investigate damage to the providers' infrastructure and then tries to collect money for them from the people who caused the damage.  After their employment with OSP ended, Fowler and Swans brought Fair Labor Standards Act ("FLSA") claims against the company and its owner (collectively "OSP") for unpaid overtime wages.

The district court granted summary judgment in OSP's favor after concluding that Fowler and Swans fit within an FLSA exemption covering "administrative" employees.  They both contend that they weren't administrative employees but instead were "production" employees who performed the core service that OSP sold to its clients: investigating damage to property.

I.        The Statutory and Regulatory Background

The FLSA generally requires employers to pay overtime to covered employees who work more than 40 hours a week, 29 U.S.C. § 207(a), but it exempts certain categories of employees from that requirement, *see id.* § 213. *See also Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1138 (2018). This "administrative exemption" applies to workers who are "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The employer has the burden of showing that the exemption applies. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974) (stating that generally "the application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof"); *Diaz v. Jaguar Rest. Grp., LLC*, 627 F.3d 1212, 1214–15 (11th Cir. 2010) (describing the administrative exemption as an affirmative defense to an FLSA claim); *see also Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 738 (5th Cir. 2020) ("In a FLSA suit for unpaid overtime, the defendant employer bears the burden of proof to establish that an employee falls under an exemption."). FLSA exemptions must be given a "fair reading" and not a "narrow" one. *Encino Motorcars*, 138 S. Ct. at 1142.[1]

---

[1] In its order granting summary judgment to OSP, the district court referred to the old rule that FLSA exemptions must be "narrowly construed," and OSP repeated the old rule in its brief to this Court. Counsel for Fowler and Swans correctly pointed out in their reply brief that regrettably (for their clients) the Supreme Court has held that the old "narrow reading" standard no longer applies. *Encino Motorcars* decision. *See* 138 S. Ct. at 1142.

The requirements for establishing that a person is an "administrative employee" are set out in a Department of Labor Wage and Hour Division regulation. *See* 29 C.F.R. § 541.200. Because the regulation is unambiguous, we must give it the meaning its terms indicate. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (explaining that if an agency's regulation is unambiguous, it "just means what it means—and the court must give it effect, as the court would any law"); *see also Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012) ("Under the statute's express delegation of rule-making authority, the Secretary has issued, after notice-and-comment procedures, detailed regulations that define each of the exemptions in § 213(a)(1)."); *Clements v. Serco, Inc.*, 530 F.3d 1224, 1227 (10th Cir. 2008) ("The Department of Labor regulations are entitled to judicial deference and are the primary source of guidance for determining the scope of exemptions to the FLSA.") (quotation marks omitted).

According to the regulation, for the administrative exemption to apply an employer must show that an employee's "primary duty" was "the performance of office or non-manual work *directly related to the management or general business operations* of the employer or the employer's customers; *and*" that it "include[d] the *exercise of discretion and independent judgment with respect to*

---

We do appreciate the candor and adherence to high standards of professional responsibility displayed by their counsel, Mitchell D. Benjamin and Matthew W. Herrington.

*matters of significance.*"  29 C.F.R. § 541.200(a)(2)–(3) (emphasis added). The conjunctive means that unless both of those requirements are met, the exemption does not apply.  *See McKeen-Chaplin v. Provident Sav. Bank, FSB*, 862 F.3d 847, 849 n.1 (9th Cir. 2017) (noting that the "test to qualify for the administrative exemption under FLSA is conjunctive, not disjunctive," so employers must "satisfy each of" its requirements); *cf. Kisor*, 139 S. Ct. at 2415 (noting that courts must give effect to unambiguous regulations).

It is undisputed that Fowler and Swans' work was "non-manual" and that their "primary duty" was conducting property damage investigations for OSP.  The question, then, is whether their investigative work was "directly related to" OSP's "management or general business operations" and, if so, whether Fowler and Swans "exercise[d] . . . discretion and independent judgment with respect to matters of significance" when they did that work. 29 C.F.R. § 541.200(a)(2)–(3). [2]

## II.   Facts

OSP contracts with broadband service providers to provide them with services related to damage that occurs to their property. The property the contract covers, if there is damage, is the

---

[2] The regulation also covers a primary duty that is directly related to the management or general business operations of an employer's customers. *See* 29 C.F.R. § 541.200(a)(2). But OSP hasn't argued that Fowler and Swans' duties had anything to do with the management or general business operations of its customers, so we don't need to address that part of the regulation.

providers' infrastructure, including fiber optic cable, aerial wires, and above ground "housing" where wires or cables are bundled and enclosed.  To provide its services, OSP divides its operations into three separate departments: damage investigation, subrogation, and recovery.  First, its investigators conduct investigations, calculate damages, and determine who caused the damage.  Then the subrogation department creates and sends to the liable party a "subrogation package," which includes an invoice for the damage. After that, the recovery department attempts to obtain a monetary settlement to compensate the broadband service provider customer for the damage.

When Fowler and Swans worked for OSP as property damage investigators in Georgia, Comcast was OSP's only client. Fowler and Swans' primary duty was to investigate damage to Comcast's infrastructure, determine who was liable for it, and calculate the cost of repairs. They did not directly participate in the subrogation or recovery parts of OSP's business, and they did not settle claims.  OSP billed Comcast by the hour for Fowler and Swans' work.  OSP classified the two of them as administrative employees under the FLSA, and as a result, did not pay them for hours they worked beyond a 40-hour work week.

According to OSP's Director of Investigations, there are "standard operating procedures that all [damage investigators] are required to follow when conducting investigations, and there are certain steps [they] have to follow."  When conducting their investigations, Fowler and Swans followed the procedures and steps

outlined in two documents: the "Damage Investigator's Responsibilities" and the "Georgia [Damage Investigator] Employee Manual."[3]

The two of them were free to choose the order in which they completed those procedures and steps, but whatever order they chose they had to gather the necessary information about the damage to Comcast's property — the "who, what, where, and when" facts. And whatever order they chose, in virtually every investigation OSP required its investigators to complete all of the steps. That was true even when the damage came from a rodent with a bushy tail (aka a squirrel) chewing through wires. As the Director of Investigations explained, even when that happens:

> [Y]ou still have to do your full investigation, your interviews, the whole nine yards. You still have to follow the same format. So once you do that and you come to your conclusion, you write your conclusion and your recommendation. So it goes to your manager. Your manager will review it and determine whether or not, you know, the case is not going to be pursued. So you still have to follow — it doesn't matter what the situation is. You still have to follow all of the steps for investigation.

---

[3] Fowler helped OSP develop the manual, but that was not his primary duty; it is undisputed that his primary duty was conducting damage investigations.

Although hungry squirrels, thieves, vandals, and car accidents, occasionally caused property damage, sixty percent of the time the cause was excavation, which most of us would call digging. That's why, as part of their classroom and field-based damage investigation training, Fowler and Swans learned to apply Georgia "dig laws" to identify who was liable for excavation damage to another's property.

It was, however, rarely unclear who violated which dig laws and was therefore responsible for the damage. As OSP's Director of Investigations testified, a "thorough investigation . . . can easily determine who's at fault and what laws they violated." He explained that most damage investigations were "simple": investigators go out, take pictures, and conduct interviews. As he said, "it's not homicide or robbery." The "biggest problem" was "just tracking [down] the people to interview."

In addition to conducting general investigations and applying state dig laws, Fowler and Swans performed onsite investigations and compiled their findings into reports that were eventually submitted to OSP's subrogation department. OSP's Director of Investigations described its overall investigation process this way:

> Once you do your onsite investigation, basically it's simple. It's the who, what, where, and when, you know, that's what you determine. And once you do your investigation, you go out to the damage scene, you collect all your information, you pull the dig ticket, and you pull pre-locate photos that the locate

> company puts down.[4] You get their post-locate pho-
> tos. That's all part of your investigation. Once you
> collect all this data, you type and you write a report
> based off your independent investigation who you be-
> lieve is at fault. Once you put all that information in,
> you take your documents, you put it in your case
> folder, and once you feel that you've completed your
> investigation, you send it to your manager for review.
> Your manager will review it and make sure all the
> documents are there, the case makes sense, and you
> pretty much determine who is at fault and they'll sign
> off on it, and it goes over to the next department.

The next department to be involved was subrogation (or "invoic-
ing"), followed by recovery. As we have mentioned, Fowler and
Swans did not do subrogation or recovery work, only investiga-
tions.

Fowler and Swans did analyze the facts and evidence they
collected during their onsite investigations to determine whether a
liable party could be identified.  If a liable party couldn't be identi-
fied, they could request that a claim be abandoned.  But for all prac-
tical purposes the liability determination was akin to plugging data
into a formula.  OSP's Area Manager and Supervisor of Damage
Investigators in Georgia testified that if a thousand different

---

4 A "locate company" is a utility location company that visits sites and "put[s]
down the locate marks" for utilities before any digging is done, creating a
"ticket" for the digging.

investigators each investigated the same damage, they should all reach the same conclusions and have roughly the same measurements,[5] even though they might arrive at their answers by slightly different methods.

Once they determined the liable party, OSP's investigators used a cost sheet furnished by Comcast to calculate the monetary value of the damages.  Investigators did not have discretion to determine the cost of Comcast's infrastructure repairs.  Instead, a Comcast technician would tell the investigators how much material was used in a repair and the type of material used, and the investigators would enter that information into a database, which would tabulate the cost of the repair materials.  Investigators had no authority to challenge the method the technicians used to make the repairs or the amount of time the technicians reported that they had spent on their work.  They took what they were told and plugged it in.

After that, OSP's investigators wrote reports summarizing their investigative findings, liability determinations, and damage calculations.  Managers reviewed those reports and then sent them to OSP's subrogation department so that the responsible party could be invoiced.  OSP did not send its investigators' reports to

---

[5] OSP's investigators took measurements during their onsite investigations, including using a measuring wheel to calculate damaged sections of cable.

Comcast.  Investigators were not involved in invoicing or settling claims.

OSP classified the following investigative duties as administratively exempt work: "reviewing permits and applicable dig laws, interviewing witnesses, conducting site inspections, and making general requests for information regarding the damage incident."

### III. Procedural History

Fowler and Swans sued OSP for violating the FLSA by not paying them overtime wages, and they sought to recover those wages, liquidated damages or prejudgment interest, attorney's fees, and costs.  OSP moved for summary judgment, asserting the affirmative defense that, as salaried investigators, Fowler and Swans were FLSA exempt administrative employees.  Fowler and Swans moved for partial summary judgment, asking the court to rule that: (1) they were not exempt administrative employees; (2) they were entitled to overtime pay under the FLSA calculated at one-and-one-half times their regular hourly rates; and (3) OSP could not prove a "good faith" defense to the FLSA violation.[6]

_____

[6] Fowler and Swans argued in their motion for partial summary judgment that OSP had produced no evidence to establish a good faith defense to liquidated damages, *see* 29 U.S.C. § 260, and that it could not establish that defense as a matter of law.  In OSP's response to that motion, it argued that good faith involves a jury question involving credibility determinations about a subjective state of mind and that it could not be decided as a matter of law.  Neither side has brought up to us any issue involving good faith, so we will not address the subject.

Their primary contention was that OSP sold damage investigation services, and as the workers who performed those investigations, they were production employees not administrative ones.

The district court applied § 541.200(a), the regulation that governs the administrative exemption.  The court analyzed Fowler and Swans' primary job duties as they related to the management of OSP's business, and it considered their exercise of discretion and independent judgment.  Concluding that Fowler and Swans were administrative employees, the court granted summary judgment to OSP and denied Fowler and Swans' cross-motion for it.  Because it determined that the administrative exemption applied, the court did not consider whether the alleged FLSA violation was willful, or the rate of any overtime compensation Fowler and Swans would have been entitled to receive.  It didn't get to damages.

## IV.   Discussion

We review *de novo* the grant of summary judgment.  *Huff v. Dekalb Cnty.*, 516 F.3d 1273, 1277 (11th Cir. 2008).  To determine whether OSP has established as a matter of law that Fowler and Swans' work fit within the administrative exemption, we consider their "primary duty," which is "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  It is undisputed that Fowler and Swans' primary duty was conducting factfinding investigations of damage to Comcast's property.  Those investigations, along with subrogation and recovery, are the service that OSP sells, the product it produces.

As we have mentioned, to establish that the administrative exemption applies to Fowler and Swans, in addition to certain salary minimums that everyone agrees are satisfied here, OSP must show that their "primary duty": (1) was "work directly related to [OSP's] management or general business operations" and (2) "include[d] the exercise of discretion and independent judgment with respect to matters of significance." *Id.* § 541.200(a). "To meet [the first] requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* § 541.201(a). Fowler and Swans contend that, as investigators, they performed "production" work, not administrative work directly related to running or servicing of OSP's business.

A Department of Labor regulation provides a non-exhaustive list of "functional areas" that are representative of administrative work: "tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." *Id.* § 541.201(b). Conducting investigations is not on the list. The jobs that are on the list generally involve duties that call for discretionary analysis and decision making. By contrast, investigative duties primarily involve investigation (of course) and

factfinding, compiling reports, and making calculations and recommendations about liability according to prescribed criteria.

A related regulation provides examples of categories of workers who "generally meet the duties requirements for the administrative exemption."  *Id.* § 541.203(a)–(f) (listing categories of workers and some of the duties they perform).  Workers who generally are administratively exempt employees include: insurance claims adjusters (so long as they have certain responsibilities, including the authority to settle claims), *id.* § 541.203(a); financial services employees (so long as they conduct analysis and do not simply sell financial products), *id.* § 541.203(b); team leaders assigned to complete major projects, *id.* § 541.203(c); executive or administrative assistants to business owners or senior executives (so long as they work "without specific instructions or prescribed procedures" and have delegated authority on matters of significance), *id.* § 541.203(d); human resources managers (but not personnel clerks who just gather information to "screen" job applicants based on minimum requirements), *id.* § 541.203(e); and purchasing agents who have the authority to bind a company on significant purchases, *id.* § 541.203(f).

That same regulation provides examples of categories of workers who "generally do not meet the duties requirements for the administrative exemption."  *Id.* § 541.203(g)–(j).  Workers who generally aren't administratively exempt include: employees who do "[o]rdinary inspection work" using "well-established techniques and procedures" often derived from manuals, *id.* § 541.203(g);

"examiners or graders" who compare products using established standards, *id.* § 541.203(h); comparison shoppers who report competitors' prices (so long as they are not responsible for evaluating reports on competitors' prices), *id.* § 541.203(i); and "inspectors or investigators of various types" in the public sector whose work involves using "skills and technical abilities in gathering factual information," applying "known standards or prescribed procedures, determining which procedure to follow, or determining whether prescribed standards or criteria are met," *id.* § 541.203(j). The regulation draws a line between administrative employees, who help run the business by setting standards, and "production" employees, who help the business run by following the standards that have been set for them.

Production employees who perform the core function of the business are not transformed into administrative employees just because the work they do is essential to what the company sells — its "marketplace offerings." *See Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002) ("The administration/production distinction . . . distinguishes between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to running the business itself.") (quotation marks omitted); *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 694–95 (4th Cir. 2009) (holding that horse race track "officials" were not administrative employees and explaining that "non-manufacturing employees can be considered 'production' employees in those instances where their job is to generate

(i.e., 'produce') the very product or service that the employer's business offers to the public") (quoting *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9 (1st Cir. 1997)); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230–31 (5th Cir. 1990) (holding that television news producers were not administrative employees and explaining that the exemption differentiates "those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market").

Department of Labor guidance indicates that when a fact-finding investigator works for a company whose business is to provide investigative services, that investigator is likely a production employee and not an administrative one.  In an August 2005 Wage and Hour Division opinion letter, for example, the Division's Deputy Administrator determined that background investigators who worked for a private firm that contracted with government agencies for background checks were production employees:

> [T]he activities performed by Investigators employed by your client are more related to providing the ongoing, day-to-day investigative services, rather than performing administrative functions directly related to managing your client's business.  From the information provided in your letter, it appears that the primary duty of the Investigator is diligent and accurate fact-finding, according to [agency] guidelines, the results of which are turned over to [the agency] who

> then makes a decision as to whether to grant or deny
> security clearances.  Such activities, while important,
> do not directly relate to the management or general
> business operations of the employer within the mean-
> ing of the regulations.

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter on the
FLSA's Administrative Exemption (Aug. 19, 2005),
https://www.dol.gov/sites/dol-
gov/files/WHD/legacy/files/2005_08_19_21_FLSA_Investigator
s.pdf; *see also* U.S. Dep't of Labor, Wage & Hour Div., Opinion
Letter on the FLSA's Administrative Exemption, 1997 WL 971811,
at \*3 (Sep. 12, 1997) (concluding that investigators who performed
background investigations were "production" employees because
investigations were the product that the business existed to pro-
duce).

Like the background investigators the opinion letter dis-
cussed, Fowler and Swans performed duties that focused on dili-
gent and accurate factfinding according to guidelines set by their
employer.  And duties that are focused on diligent and accurate
factfinding differ substantively from duties related to managing a
company's business.  Duties related to managing a company's busi-
ness typically involve significant decision-making authority, includ-
ing authority to make policy-level decisions.  *Compare* 29 C.F.R. §
541.203(a) (referring to administratively exempt insurance claims
adjusters' authority to negotiate settlements and make recommen-
dations about litigation), *with Deluca v. Farmers Ins. Exch.*, 386 F.
Supp. 3d 1235, 1256–57 (N.D. Cal. 2019) (determining  that special

18                    Opinion of the Court                    19-12277

investigators' "primary duty of conducting factual investigations that inform the [insurance] [c]laims representatives' ultimate determination of whether to pay claims does not qualify as 'directly related' to running [the insurance company's] business or formulating or helping to execute policy," and as a result, the administrative employee exemption does not apply).

The reason that insurance claims adjusters, a category of employees that the district court relied heavily on, are generally considered administrative employees is that they do have significant, policy-infused, decision-making authority, including evaluating and making recommendations about coverage for claims, negotiating settlements, and making recommendations about litigation. *See* 29 C.F.R. § 541.203(a).[7] There is no evidence that Fowler

_____

[7] The regulation relating to insurance claims adjusters provides:

> Insurance claims adjusters generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other type of company, if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation.

29 C.F.R. § 541.203(a). While it's true that Fowler and Swans performed some of the activities listed in § 541.203(a), they had no authority to negotiate settlements or make recommendations about litigation, which are key

and Swans' duty to conduct factfinding investigations involved any authority to make higher-level business decisions, like administratively exempt insurance claims adjusters have.  *See Deluca*, 386 F. Supp. 3d at 1256–57.

The Department of Labor has also determined that certain public sector investigators who focus on factfinding investigations are not administrative employees.  A regulation covering law enforcement investigators explains that:

> [I]nvestigators, inspectors, . . . and similar employees, regardless of rank or pay level, who perform work such as . . . preventing or detecting crimes; conducting investigations or inspections for violations of law; . . . interviewing witnesses; . . . preparing investigative reports; or other similar work . . . do not qualify as exempt administrative employees because their primary duty is not the performance of work directly related to the management or general business operations of the employer or the employer's customers as required under § 541.200.

29 C.F.R. § 541.3(b)(1), (3).  Like law enforcement investigators, Fowler and Swans were primarily engaged in factfinding investigative work.  And the Department of Labor's opinion letters and

---

components of the authority vested in insurance claims adjusters.  Nor did Fowler and Swans' duties include any comparable authority.

20                    Opinion of the Court                    19-12277

regulations reflect its position that the administrative exemption does not apply to investigators with those types of duties.

Other circuits that have considered whether factfinding investigators are administrative employees have concluded they are not. Evaluating investigators with job duties strikingly similar to the ones Fowler and Swans performed, the Fourth Circuit determined the administrative exemption did not apply to them. *See Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 130 (4th Cir. 2015). In *Calderon*, the court concluded that insurance company employees who investigated fraudulent claims were not administratively exempt because the "applicable regulations and Labor Department opinion letters . . . indicate that employees whose primary duty is to conduct factual investigations do not satisfy the directly related [to business operations] element, even when the work is of significant importance to the employer." *Id.* at 125. The court affirmed the grant of summary judgment in the investigators' favor, holding that the administrative exemption did not apply because their primary duty was to conduct interviews and report their findings, which was not directly related to the insurance company's management or general business operations. *Id.* at 130.

Comparing the fraud investigators in *Calderon* to claims adjusters, the Fourth Circuit explained that an adjuster's primary duty involved more than just investigation; an adjuster had to "adjust insurance claims by investigating, assessing, and resolving them." *Id.* at 117. An adjuster had the important responsibilities of "decid[ing] how much, if anything," the insurance company would

pay on a claim and of "negotiat[ing] any settlements." *Id.* By contrast, the fraud investigators' primary duty, on which they spent "about 90%" of their work time, was to investigate claims that were referred to them as potentially fraudulent; they initiated investigations only in "limited circumstances." *Id.* The fraud investigators had to follow company procedures when handling the referred claims, which required a "thorough investigation," "[i]dentification and interviews of potential witnesses," use of "industry recognized databases," "[p]reservation of documents and other evidence," and a summary of the investigation that included their findings about "the suspected insurance fraud and the basis for their findings." *Id.*

Those company-mandated procedural steps in *Calderon* often required the fraud investigators to interview witnesses, including preserving their testimony and evaluating their credibility; taking photographs; and reviewing property damage. *Id.* While those procedural steps "govern[ed]" investigations, the fraud investigators still had to "use their judgment to determine exactly how to conduct their investigations and what inferences to draw from the evidence they uncover[ed]." *Id.* at 117–18. And most fraud investigators had to submit their investigation reports to a supervisor for input and review. *Id.* at 118. They had "no supervisory responsibility" and didn't "develop, review, evaluate, or recommend" business "polices or strategies." *Id.* at 124 (quotation marks omitted).

As a result, the Fourth Circuit concluded in *Calderon* that even though the fraud investigators' work was "important" to the

company, they were "in no way part of the management" and did
not "run or service the general business operations" of the com-
pany. *Id.* (cleaned up). Instead, "by assisting" adjusters in pro-
cessing claims, the fraud investigators' "duties simply consist[ed] of
the day-to-day carrying out of [the company's] affairs to the pub-
lic." *Id.* (cleaned up).

Like the *Calderon* fraud investigators, Fowler and Swans in-
terviewed witnesses, made credibility determinations, preserved
evidence, took photographs, and reviewed property damage.
They followed OSP's prescribed procedures while using their judg-
ment to decide the order of the steps in their investigations and
what inferences to draw from the data they gathered. They wrote
reports and submitted them to their supervisors. They did not set-
tle claims or develop business strategies. And like the fraud inves-
tigators, Fowler and Swans performed duties that were important
but were neither managerial nor directly related to running OSP's
business.

They were factfinders whose work enabled OSP's subroga-
tion and recovery departments to collect money from those who
damaged property belonging to its client, Comcast. The nature of
the jobs Fowler and Swans did is similar to that of the *Calderon*
fraud investigators, whose investigations helped insurance adjust-
ers resolve claims but who were not adjusters themselves, and who
had no authority to settle a claim. *See* 809 F.3d at 129–30.

There can be no doubt that Fowler and Swans' work was
*essential* to the service OSP provides — the company bills by the

hour for its investigators' time and uses investigative findings as the basis for collecting money from people who have damaged its clients' property. But as essential as their work was, Fowler and Swans were not part of OSP's management, and they did not run or service the general business operations of the company.

The importance of the work that employees do does not make them administrative employees. *See Desmond*, 564 F.3d at 694; *Bothell*, 299 F.3d at 1128; *Reich*, 126 F.3d at 11; *Dalheim*, 918 F.2d at 1231. Fowler and Swans did important work, but the exemption is not for all of those who do important work; it is only for those who do administrative work. The two of them did important, non-administrative work.

Fowler and Swans engaged in OSP's core function of damage investigations. Given the nature of their employer's business, their investigative factfinding duties amounted to production work. Those duties did not involve "work directly related to [OSP's] management or general business operations." 29 C.F.R. § 541.200(a)(2). We need not address whether their work met the additional administrative exemption requirement of "includ[ing] the exercise of discretion and independent judgment with respect to matters of significance." *Id.* § 541.200(a)(3). Both requirements must be met for the exemption to apply. *See id.*

## V.    Conclusion

OSP has failed to show that the FLSA's administrative exemption applies to Fowler and Swans. As a result, we VACATE

24                    Opinion of the Court                    19-12277

the judgment of the district court and REMAND for further pro-
ceedings consistent with this opinion.

**VACATED AND REMANDED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 27, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  19-12277-GG
Case Style:  Philip Fowler, et al v. OSP Prevention Group, Inc., et al
District Court Docket No:  1:17-cv-03911-MHC

Electronic Filing

All counsel must file documents electronically using the Electronic Case Files ("ECF") system,
unless exempted for good cause. Although not required, non-incarcerated pro se parties are
permitted to use the ECF system by registering for an account at www.pacer.gov. Information
and training materials related to electronic filing are available on the Court's website. Enclosed
is a copy of the court's decision filed today in this appeal. Judgment has this day been entered
pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP
41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for
filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise
provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is
timely only if received in the clerk's office within the time specified in the rules. Costs are
governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for
attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested
Persons a complete list of all persons and entities listed on all certificates previously filed by
any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be
reheard must be included in any petition for rehearing or petition for rehearing en banc. See
11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation for time spent on the appeal no later than 60 days after either issuance of mandate
or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via
the eVoucher system. Please contact the CJA Team at (404) 335-6167 or
cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher
system.

Pursuant to Fed.R.App.P. 39, <u>costs taxed against the appellees</u>.

Please use the most recent version of the Bill of Costs form available on the court's website at <u>www.ca11.uscourts.gov.</u>

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call <u>Joseph Caruso, GG</u> at <u>(404) 335-6177</u>.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

                                                                OPIN-1A Issuance of Opinion With Costs